Marlow for the appellate, your honor. In the matter before the court today, we addressed the issue of expungement and as it relates to a presidential pardon. Hitting some brief review of that, that was, the constitution was drafted in 1787 and in article two, section two, it specifically gives the president, that language reads, and he shall have power to grant reprieves and pardons for offenses against the United States with the exception of impeachment. There have been multitudes of cases where the pardon itself has been and reviewed for a variety of discernment about its reach. Several of those cases have been significant and addressed the expungement issue, quite often limiting it in a great way. I would argue with all deference to those cases that when it says that an individual can be relieved from the burden of that prior conviction, that that should grant far-reaching strength of the court to relieve them of the consequences of it. In the time period since the constitution went into effect and the ability of the president to pardon was granted, the far-reaching ramifications of the actual felony conviction have reached into civil areas, licensing areas, and they've been addressed by quite a few of those cases. Each time there has been a ruling about those, quite often the court has reserved that there will be an exception to that in exemplary circumstances. One of the cases, Garland from 1866, says that the court affirmed the pardon and that it should restore the individual to their status before the offense. I'm going to get into my client's individual circumstances, but clearly that is not the case when someone comes after a pardon and is still adjudged a convicted felon as the conviction and its convicted felon status carries with us far after that. Skipping past a few of the historical things, we then go to the specific facts as they relate to the appellant here. My client was a doctor practicing in the Mississippi Delta. Those facts become extremely relevant, and as Judge Davidson addressed in his opinion, and I'm sure in reviewing the matter, the court's aware that counsel opposite of myself had this hearing before Judge Biggers, and then subsequent to that, unfortunately, he fell ill, passed away, and Judge Davidson then issued the ruling. Judge Davidson, in his opinion, points out that factually, my client, at the point we're hearing this, has returned to life. He is back practicing medicine in the Mississippi Delta. He, in effect, is doing everything he needs to in life, with the exception that he's unable to bill through Medicaid. Judge Biggers, during the hearing, asked quite a few questions about that, because being a judge from the Northern District of Mississippi, he was aware of the impoverished nature of the Mississippi Delta, particularly Greenville, and the fact that my client continued to practice medicine there. One other fact that I'd like to point out is that Dr. Corcoran was sentenced on November the 13th of 2012. His pardon is in 2021. At the point he's pardoned, he has already returned to life. He is basically at a place in life where the pardon does him no good. It doesn't relieve him of any jail sentence. It doesn't relieve him of the restitution. There's a reference to it, but it had already been relieved. The fact is that the pardon had no impact on Dr. Corcoran. The reality is that without the pardon, he would not have an argument for expungement. I think the pardon gives him that in that very narrow manner in which there is that exceptional circumstance. Without the expungement of the conviction where he can indicate that he is, in fact, no longer a convicted felon, he will not be able to, or so far has not been able to, achieve billing through Medicaid. As the court is, I'm sure, aware, the Mississippi Delta has an incredibly large number of individuals that are, in fact, covered by that particular type of health care. If we can't take judicial notice of it, at least it's pretty obvious. Yeah. Thank you. So what would be the specifics of the ruling that, in your view, we should make? Would it be to restore your client to the status that he enjoyed before the conviction? Or what would be the particulars of what we would say? Judge Smith, I think that's a great question, and I actually have thought about that tremendously. The reality is, because there's several rulings that say you can't make it as though the event didn't occur, and that's not what my client is asking. The reality is there would be several different options that I think the court could take. Probably the most concise would be a simple conviction and nothing else. Wouldn't have to expunge the arrest, the facts, the indictment. The facts would still be there. We would not be rewriting history. The fact is that he was indicted. He was charged. He was tried. Well, he actually pled guilty, and he was subsequently convicted. But then the use of the pardon to expunge the simple conviction itself would allow him to do that. Perhaps even a simple ruling from the court that would allow him the authority to answer that question as though he had not been convicted so that he would not be now guilty of a separate felony, which would be lying on a federal form or federal application. So you want a ruling that would insulate him from perjury? In effect, that would be correct. And, well, because it would define that he would not be committing perjury. If he could at that point say that I had been relieved of that conviction for that purpose. But simply, and there are several state statutes, and I do not find a federal statute that allows for it, although there's some language in some of the cases that allow those state statutes specifically say that an individual going forward after the expungement can respond without penalty of perjury that they have not been convicted. A type of ruling that would insulate him in that manner for these exceptional circumstances. Because, again, if you look at the timing, you can see from the pardon, the appellate received no benefit from the pardon, in effect. He had already returned. He was billing insurances. He was working. He worked through COVID with this handicap. And it was an extremely difficult thing. I would imagine there was some hoop jumping where he was directing nurse practitioners who may have been able to bill. But the number of people that were treated at that facility in Greenville, Mississippi during COVID could have used another doctor that would have been able to bill under that. I'm sure when he, did you represent him at the guilty plea? No, I did not, Your Honor. Well, it's highly likely that when he pled guilty in the run-up to that, his lawyer thoroughly, thoroughly went over not only elements of the offense, but the clear consequences of a conviction, whether by jury or otherwise, to wit, you know, the medical practice, et cetera, et cetera. And in some regards, one might even lose their medical license. But he did not. And that's not an issue. But he clearly knew when he pled guilty that he was, you know, giving up all these things, you know, for the benefit of other things, but goes along with, you know, the guilty plea. So I ask you, if a person pled guilty to 18 U.S.C. section 1001, which is making a false statement, okay, and at the time, you know, the statement was false, but at some later point, whatever the statement was, was eviscerated, doesn't exist anymore, no longer on the books, whatever, so would such a person be able to come in and say, well, that's not on the books anymore, that's not wrong anymore, therefore, you know, I should get expunged because what was false then isn't false anymore. Do you follow my question? I do, Your Honor. And I don't think they could do that. And I want to make it clear that I'm not standing before the court on my client's behalf saying he didn't commit this, this did not happen. And the court is spot on point about, as the plea colloquy went through, he would have acknowledged to the district judge, hey, Judge, and it was Judge Biggers, that I'm aware, these constitutional rights are going to be lost by me in this plea process. That is the unique door that is open to us because of the presidential pardon. Again, I've read the cases, I'm aware that this is not a gaping door, a barn door we want to kick wide open. Without these unique facts for Dr. Cochran and his need for that, I don't think it would be a compelling argument for the court. I think it has a narrow window of that exceptional circumstance that allows him to go back to the people of the a Hollywood doctor or whatever. Well, I shouldn't put it that way. Let's say he does plastic surgery on people who want to get rid of birthmarks and tattoos and other kind of stuff. Not that I'm putting that down, but it's elective and so forth. It's lucrative and a whole schmeal, but, you know, it's not Medicaid eligible, shall we say. So, I mean, you know, not. So, I mean, what you're really saying, the fact of the nature of the practice in the Delta, albeit, you know, it just screams at you, but, you know, could that be the inertia for the holding? You follow what I'm saying? I do, Judge Stewart, and I think your analysis is very accurate. I don't think I could be standing here with a straight face before the court requesting this if my client was doing nip and tuck work and cosmetic work here. He is an on the ground, frankly, rural doctor in what is the biggest urban environment in the Mississippi Delta, and that need is tremendous. Just simply recruiting doctors. I mean, I got you, but you're asking for equitable relief in a legal box. It's Christmas time of season, so you want equitable relief packaged in a legal encasement. Those are my words, and I'm not making light of the argument. I'm just, you know, since I read the briefs here, I'm just saying, but essentially, it's a request for equitable relief. You know, look at those underlying circumstances and say because of that, there should be this needle hole that he should get through because, because. Judge, and I'm going to conclude with this and maybe preserve one minute for rebuttal. Actually, it's from Judge Davidson's opinion that I'm actually quoting his, and when he denied the relief, the judicial editing of history is likely to produce a greater harm than sought to be corrected. That's from Rogers 469 F. Second 1085. Any number of reasons may lie behind the granting of an executive pardon, but the granting of a pardon does not in and of itself defect the previous conviction. That is not what we're trying to do here. We're trying to deal with the reality that the pardon opened that narrow door for the exceptional circumstances and that this is an appropriate place not to rewrite that history, but to nip out that one place, the conviction, so as my client would have that ability to aid there. If there are no other questions, I'll reserve one minute. You've saved a full five minutes for rebuttal, Mr. Harlow. Thank you. Mr. Dabbs. Thank you, Your Honor. May it please the Court. My name is Clay Dabbs. I'm an AUSA in the Northern District of Mississippi. I was involved in this case back when Dr. Corcoran was indicted. When he pled guilty, he eventually testified as a government witness, was sentenced, and actually did file a 2255 that was denied, which he did not appeal. Dr. Corcoran pled guilty to essentially bribing the county administrator of Panola County, and there is no indication as we sit here today that there's any issue with his underlying conviction. He was pardoned in January of 21, just as President Trump's term was coming to an end, and shortly thereafter filed this motion for expungement. So there is no statutory authority for Dr. Corcoran's expungement. He's not suggesting that there is. There are statutes that allow for expungement, such as a simple possession charge if you're under the age of 21. There are certain circumstances where there are statutes that say you can expunge the records. So obviously Congress has the, if they do it in that case, then they certainly could do it in the case of a pardon if they chose to and have not done that. There's no allegation that there's some constitutional basis for the expungement because there's no problem with the underlying conviction. So Dr. Corcoran is asking for an equitable expungement, and it appears to me that- Explain, I don't mean to interrupt your train of thought, but explain to us a little bit about how it works with a pardon. The president offers the pardon. Is it up to the convicted person to enter some kind of a document accepting the pardon? In other words, there would be situations in which someone has been convicted but still denies guilt and still denies that he or she committed the act. That's not what's going on here. But is there some acknowledgement on behalf of the person, yes, I did it, thank you very much for the pardon, I accept the pardon? Or how does that work? My understanding is that just when the president enacts it, it's done. Now how he's able to answer a question, have you ever been convicted of a felony? I don't really have a position on that. But there's no response required or customarily received from the person who receives it? I'm just asking the question because I don't know. I actually don't know that. I don't think there is. Can I say definitively? I don't think there is, but I don't know that. I think the power just lies with the president. When the president pardons you, the conviction is gone. I mean, are there particular terms to particular pardons that some vary in the breadth of what's pardoned? I actually don't know. Like pardoning for specific crimes or pardoning for more than that? Right, okay, so I've been in the news recently that apparently you can pardon for, I guess, a period of time, maybe prospective charges that haven't been filed. In this case, it was a pardon of a specific crime. You were convicted of this, I'm pardoning you for this conviction. So in this case, it was specifically to his conviction that he pled guilty to and was sentenced. Well, I mean, what benefit, in your mind, what benefit did he get from that, if any? Well, it restored whatever rights were taken away as part of his felony conviction. So possession of a firearm, if he's prevented from voting, that kind of thing, he's getting that back. Okay, so firearms, voting? Whatever he was prevented from being able to do because he had a felony conviction, he's getting that back. Now, I don't know that expungement would solve his problem with Medicaid. I don't know what's going on with Medicaid. So it's not clear to me that they couldn't give him his privileges back now. I don't have any position on any of that. Was there a period in which his medical license was in jeopardy? I just have sort of a vague recollection, at least in Louisiana, on a felony conviction, the medical board sort of cranks up, you know what I mean? And so I was just curious in the history of it, whether or not he ever lost his medical license to practice medicine. And then when he got a pardon, that allowed, you know what I mean, restoration to be able to practice, putting aside the question of the Medicaid, but just to be able to practice, period. Or do you know the history of it? My understanding is he did lose his medical license, but he got it back pretty quickly. I don't know exactly when, but it was before the 2255 was filed. I do remember that. So he'd gotten his medical license back at that point. The issue was Medicare, Medicaid, and I guess insurance. And if I remember the hearing before Judge Biggers on the motion to expunge, he had gotten his Medicare privileges back, but not Medicaid. And that was, now, Mr. Harlow can answer that exactly. When the pardon issues, I'm curious, like my colleague, when the pardon issues, does the government, the United States, I mean, like, you know, receive a carbon copy, so to speak, so the government is, quote, you know, like, on notice, or is it like, you know, when I got out the Army, I took my DD-214 and I filed it in the clerk's office for all the world to know, you know, forever. I'm not being facetious, but this morning, when it happens, does the government sort of get it, you know, is it filed or something, so for other purposes, he has that to, you know, to rely on. Somebody didn't have to just take his word, hey, I've been pardoned, you know, he can say, or the government, you know, has you right or whatever. So, there are times when we get, they communicate with us before the pardon. I don't think that happened in this case, but there's an actual pardon in the document that I've seen that Mr., that Dr. Corcoran has. Now, I actually looked at PACER before I came down here just to see if there was anything on the docket. There's not anything on the court docket that indicates that he's been pardoned. There's no dispute by us that he hasn't been pardoned, but as far as I know, the proof of the pardon is the actual document signed by the president that he has. I wondered the same thing, would there be some kind of notation on the docket that he'd been pardoned, but there's not that I'm aware of. Okay, curious. If someone were pardoned and then the state of Mississippi said he couldn't vote, I assume that he could sue to restore his voting rights. I assume that he could, but that would be a... Even if there's not a statute, that would be a constitutional right. It would be a suit against the state of Mississippi. Right. And of course, if we, for some reason, indicted him for possession of a firearm, then he would take that pardon and say, no, no, I can't be guilty of this. So, his dispute now is really with Medicaid. We have no control over Medicaid or the contractor that administers Medicaid, and I don't know that this... I mean, Judge Biggers actually said this in his sentencing when he was sentenced. He said, I hope he gets to continue to practice medicine. He said that in court. He said, I don't have any control over what the state medical board or Medicaid does, but I hope that he gets to practice medicine. So, even if the court reversed the district court and granted the expungement, I don't know that it would solve the problem, but again, I don't speak for Medicaid. I don't have any control over Medicaid. But the question in an equitable expungement is, how do you even get to the facts in the first place? And that is, you have to have authority from somewhere. You have to have jurisdiction. And the case that appears to be the case, and the significant case of this search, obviously is Judge Smith's opinion in the sealed appellate case. And that says, you either have specific statutory authority, which we don't have, or there's an affirmative violation of constitutional rights. So, there's no allegation that there's an affirmative allegation of constitutional rights, so there is no jurisdiction to begin with to even hear the motion to expunge, which is what the district court found. Now, I'll confess, I was confused when I read sealed appellate the first time as to whether it applied to judicial records or just to the executive branch. Anytime someone files a motion to expunge, they're going to want to expunge the executive branch records, because that controls the database checks, and the background checks are going to flag as long as the executive branch is still guided in the NCIC. So, it wasn't entirely clear to me that it applied to judicial records, but it does appear that that is the way it is being applied. It's an unpublished case, Mellowar, from 2009 in this circuit, is a one-page, just cite sealed appellate that says there's no jurisdiction, because there's no affirmative violation of rights. There are several district courts that have done the same thing, and that's what the court did in this case. I don't know. So, in an expungement motion, to be successful, it would almost certainly follow a motion to dismiss that's successful, or like a post-trial motion that's successful, or a 2255. There'd have to be some kind of assertion of the violation of rights to get to the expungement in the first place, and we don't have that here. I don't know if the court, there is a Supreme Court case that a lot of circuits have talked about Kekonan. I don't know if the court wants to address that or not. I think it's totally up to the court as to how far you go down that road. Most circuits that have looked at Kekonan have come to the same conclusion that there is no jurisdiction over an equitable expungement. There is one case, I actually have a footnote in my brief that's wrong. I said every circuit had found the same thing looking at Kekonan. The Tenth Circuit found, chose not to follow the Kekonan line of cases and said, no, our precedent still stands on this kind of balancing test for expungements. That's U.S. versus Traska, T-R-Z-A-S-K-A. It's a 2019 case from the Tenth Circuit. That was a case where the conviction was dismissed after losing a motion to suppress, which that's a much better argument for expungement if you lose a motion to suppress than if you plead guilty, you're convicted, and then you get pardoned. There's also a case, again, not in my brief, if the court is interested, in the Eleventh Circuit, Batch-Mazian case. This is 66F4-1278 from 2023. It is exactly the same situation. It is a wealthy person was pardoned, and they claim that their constitutional rights are being violated because they can't give money. They can't express their freedom of speech and give money without the stigma of this conviction. The Eleventh Circuit finds there is no jurisdiction over that and dismisses it. The Eleventh Circuit has clearly said that in the case of a presidential pardon, you cannot give an expungement. I believe the Noonan case, which is an older case in the Third Circuit, was the same. Those were the folks that were pardoned. I believe it was everyone that violated the Selective Service Act or dodged the draft during Vietnam. President Carter pardoned them all, which if there was a . . . it seems like that kind of situation might warrant . . . would be a pretty good argument for expungement, and that was denied in the Noonan case in the Third Circuit. So, I think the court could certainly do exactly what the court did in Mellowar. It could cite sealed appellate, say that's the rule in the Fifth Circuit, and this expungement is denied. You also could choose to go down this path of Kekonan that other circuits have done. Kekonan was a civil case talking about the enforcement of a settlement agreement, so it's not about expungement. It's not a criminal case. That's basically what the Tenth Circuit said, why they chose not to do that. So, regardless, however you get there, you come to the same conclusion, which is a motion to expunge regardless of the underlying facts. There's no jurisdiction for the court, and the district court was correct in denying the motion to expunge, and we would ask the court to affirm the district court in that decision. If there are no other questions, I will yield the rest of my time. Thank you, Mr. Dabbs. Thank you. Thank you. I do want to point out in response, frankly, to some questions of counsel opposite, you can reject a pardon. There are several cases where pardons have been rejected, one by a newspaper reporter who was refusing to testify, and he was pardoned, and he said, I'm still not testifying, so you can, in fact, reject that. It's an odd fact. I found it on a couple of cases. In addition, I want to point out one fact that another question that was asked. While there is the pardon itself is a singular document, and I think it's in the record, and I believe it is. If it's not, I will be glad if the court would grant leave to supplement the record, but it is actually signed by the acting pardon attorney, not the president himself. I thought the president would sign them, but that's how it's signed on his behalf, and it goes through great detail about it as well. This one is the pardon is for the specific crime that he pled guilty. The specific crime that he pled guilty to in that particular event, not any period of time, but just that crime. Just quickly, to fill in on just my question, did he lose his medical license as a result of the conviction? I guess when he got the pardon, did that restore it? I think he was suspended from the practice, and as counsel officer pointed out very learnedly, he had operated during that period. I came in after that, but I don't think his license was actually ever taken. It might have been suspended while an investigation was done, but that was a very brief period of time. All the time that I've worked for him, he's been practicing. There is a case that I want to point out. It's Minyard v. Saxby 498 F. 2nd 1017. It's in our brief. It's a DC 1974 case, and that has some really strong language. Judicial remedy of expungement is inherent, and it's not dependent on express statutory provision. It exists to vindicate substantial rights provided by statute as well as organic law. But here it talks about the balancing of public interest versus the private interest. My client really won't get a big benefit from this, but some people will, and the hospital in particular will. But I do want to point out one fact as well. He will ask about gun rights. If you apply for a gun license, it specifically says, not a license, just to get one, are you a convicted felon? He's still got to answer that yes, I know, because I got that phone call, and I said, until there's a ruling, you're a convicted felon. And so he does not, has not purchased a gun because of it. I think it might act as a defense if he, in fact, were charged as a felon in possession of a weapon, but when he goes to apply for the purchase of a weapon, he has that distinction. That's not why we're here, but that fact is there. One more just information question. Counselor, you said he's able to participate in Medicare. The disallowance is Medicaid, right? That's correct. Has he specifically, I'm not saying that's the answer here, but has he requested restoration with Medicaid, and Medicaid says, nope, sorry about that, unless da da da da, and he says, yeah, but I have Medicare? He has requested those on a repeated basis prior to the pardon and after the pardon, and just so that I could represent this, because that is ongoing, I confirmed with him yesterday that he has been granted nothing, no type of relief there at all. He said, I'm not going to quit asking, but I have not been granted any relief. I'll be glad to respond to any questions. All right, thank you, Mr. Brown. Thank you all very much. Your submission, and as previously announced, we'll take a brief